No. 14-1401

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

SEWELL COAL COMPANY,

*Petitioner,*

v.

WILLIAM O. DEMPSEY, and

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,

*Respondents.*

ON PETITION FOR REVIEW OF A DECISION AND ORDER
OF THE BENEFITS REVIEW BOARD
UNITED STATES DEPARTMENT OF LABOR

**OPENING BRIEF OF PETITIONER,
SEWELL COAL COMPANY**

Kathy L. Snyder
Jeffrey R. Soukup
Jackson Kelly PLLC
P.O. Box 619
Morgantown, WV  26507
(304) 284-4100
ksnyder@jacksonkelly.com
*Counsel for Sewell Coal Co*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

No. <u>14-1401</u>               Caption: <u>Sewell Coal Company v. William Dempsey</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Sewell Coal Company</u> who is <u>Petitioner</u>, makes the following disclosure:

1.     Is party/amicus a publicly held corporation or other publicly held entity?
       <u>  X  </u>YES     <u>_____</u>NO

2.     Does party/amicus have any parent corporations?   <u>  X  </u>YES     <u>_____</u>NO

         Sewell Coal Company merged with Meadow River Mining Company.
         Meadow River Mining Company is a wholly owned subsidiary of
         Thames Development Ltd., which is a wholly owned subsidiary of
         Pittston Coal Company.  Pittston Coal Company is a wholly owned
         subsidiary of Pittston Minerals Group, Inc., which is a wholly owned
         subsidiary of The Brinks Company.

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held
       corporation or other publicly held entity?   <u>  X  </u>YES <u>_____</u>NO

         The Brinks Company is a publically traded company on the New
         York Stock Exchange.

4.     Is there any other publicly held corporation or other publicly held entity that
       has a direct financial interest in the outcome of the litigation (Local Rule
       26.1(b))?
                   <u>_____</u>YES   <u>  X  </u>NO

5.     Is party a trade association?
                   <u>_____</u>YES   <u>  X  </u>NO

6.     Does this case arise out of a bankruptcy proceeding?
                   <u>_____</u>YES   <u>  X  </u>NO

<u>/s/ Kathy L. Snyder            </u>              <u>July 9, 2014</u>
*Counsel for Sewell Coal Company*

**TABLE OF CONTENTS**

I.   STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ............................................................................1

II.  STATEMENT OF THE ISSUES ....................................................2

1.   Did the ALJ err by discrediting physicians for relying on the medically accepted radiographic presentation of coal workers' pneumoconiosis to support their conclusions?

2.   Did the ALJ err by failing to weigh the x-ray evidence together with the medical opinion evidence and by not resolving conflicts in the radiographic evidence?

3.   Is the ALJ's analysis of the physicians' qualifications and credentials inconsistent and irrational?

4.   Are the ALJ's reasons for discrediting Dr. Renn's medical opinion irrational, unsupported by substantial evidence, and contrary to the applicable law?

5.   Are the ALJ's reasons for crediting the medical opinions of Drs. Rasmussen and Dr. Cohen irrational, unsupported by substantial evidence, and contrary to the applicable law?

III. STATEMENT OF THE CASE .......................................................3

   A.   Procedural History ..............................................................3

   B.   Relevant Facts ...................................................................12

IV.  SUMMARY OF THE ARGUMENT ............................................16

V.   ARGUMENT.............................................................................19

   A.   Standard of Review ...........................................................19

   B.   Discussion of Issues .........................................................20

1.    The ALJ erred by discrediting physicians for relying on the medically accepted radiographic presentation of coal workers' pneumoconiosis to support their conclusions............20

2.    The ALJ erred by failing to weigh the x-ray evidence together with the medical opinion evidence and by not resolving conflicts in the radiographic evidence. ....................25

3.    The ALJ's analysis of the physicians' qualifications and credentials is inconsistent and irrational ................................27

4.    The ALJ's reasons for discrediting Dr. Renn's medical opinion are irrational, unsupported by substantial evidence, and contrary to the applicable law ...........................34

5.    The ALJ's reasons for crediting the medical opinions of Drs. Rasmussen and Cohen are irrational, unsupported by substantial evidence, and contrary to the applicable law..........42

     a.    Dr. Donald L. Rasmussen ...............................................42

     b.    Dr. Robert Cohen ..........................................................43

VI.    CONCLUSION.........................................................................48

VII.    REQUEST FOR ORAL ARGUMENT ......................................49

VIII.    ADDENDUM OF STATUTES, RULES, and REGULATIONS .................50

IX.    CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

X.    CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adkins v. Director, OWCP*,
    958 F.2d 49 (4th Cir. 1992) .......................................................... 32

*Allentown Mack Sales and Serv., Inc. v. NLRB*,
    522 U.S. 359 (1998)....................................................... 40, 45, 47

*Alley v. Riley Hall Coal Co.*,
    6 Black Lung Rep. (Juris) 1-376 (Ben. Rev. Bd. 1983) ................................ 29

*Barren Creek Coal Co. v. Witmer*,
    111 F.3d 352 (3d Cir. 1997) ........................................................ 27

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)................................................................. 3

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938)................................................................ 19

*Dehue Coal Co. v. Ballard*,
    65 F.3d 1189 (4th Cir. 1995) ....................................................... 19

*Director, OWCP v. Greenwich Collieries*,
    512 U.S. 267 (1994)....................................................... 23, 45, 46

*Freeman United Coal Mining Co. v. Stone*,
    957 F.2d 360 (7th Cir. 1992) .............................................. 28, 32, 33, 35, 43

*Gunderson v. U.S. Dep't of Labor*,
    601 F.3d 1013 (10th Cir. 2010) ..................................................... 28

*Island Creek Coal Co. v. Compton*,
    211 F.3d 203 (4th Cir. 2000) ............................................... 17, 19, 26

*Milburn Colliery Co. v. Hicks*,
    138 F.3d 524 (4th Cir. 1998) ................................................ *passim*

*Owens v. Mingo Logan Coal Co.*,
    25 Black Lung Rep. (Juris) 1-1 (Ben. Rev. Bd. 2011) ................................. 45

iv

*Pancake v. AMAX Coal Co.*,
   858 F.2d 1250 (7th Cir.1988) ....................................................28, 32, 33, 35

*Rose v. Clinchfield Coal Co.*,
   614 F.2d 936 (4th Cir. 1980) ..........................................................45

*Scott v. Mason Coal Co.*,
   14 Black Lung Rep. (Juris) 1-37 (Ben. Rev. Bd. 1990) ................................32

*Smouse v. Marsolino Coolspring Quarry, Inc.*,
   2000-BLA-381 (OALJ Sept. 29, 2000) (unpub.) ........................................31

*Stephenson v. Island Creek Coal Co.*,
   2003-BLA-6405 (OALJ Mar. 10, 2006) (unpub.)......................................31

*Sterling Smokeless Coal Co. v. Akers*,
   131 F.3d 438 (4th Cir. 1997) ................................................19, 32

## Statutes

Administrative Procedure Act
   5 U.S.C. § 501.................................................................................3
   5 U.S.C. § 557(c) .....................................................................28, 50
   5 U.S.C. § 557(c)(3)(A)....................................................25, 27, 31, 37, 43

Black Lung Benefits Act
   30 U.S.C. § 901–945..........................................................................1
   30 U.S.C. § 921(c)(4) .......................................................................45
   30 U.S.C. § 932(a) ...........................................................................1

Longshore and Harbor Workers' Compensation Act
   33 U.S.C. § 921(c) ...........................................................................1

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148, § 1556, 124 Stat. 119 (Mar. 23, 2010) .................3, 50

## Regulations

Part 718: Standards for Determining Coal Miners' Total Disability or Death Due to Pneumoconiosis

20 C.F.R. § 718.2 (2012) ....................................................................3
20 C.F.R. § 718.201(a)(1) (2012)..........................................11, 16, 20
20 C.F.R. § 718.201(a)(2) (2012).........................................................11
20 C.F.R. § 718.202(a)(1) (2012)............................................21, 23, 28, 53
20 C.F.R. § 718.202(a)(4) (2012)......................................................26, 53
20 C.F.R. § 718.304(d) (2012) ...........................................................45

Part 725:  Claims for Benefits Under Part C of Title IV of the Federal Coal Mine Safety and Health Act, as Amended

20 C.F.R. § 725.2 (2012) ............................................................. 3, 53
20 C.F.R. § 725.482(a) (2012)...............................................................1

## Administrative Materials

Black Lung Benefits Act: Standards for Chest Radiographs,
79 Fed. Reg. 21606 (Apr. 17, 2014) ...............................................3

Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act: Determining Coal Miners' and Survivor' Entitlement to Benefits
78 Fed. Reg. 59102 (Sept. 25, 2013) ..............................................3

Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended
65 Fed. Reg. 79920 (Dec. 20, 2000)............................................. 3
68 Fed. Reg. 69930 (Dec. 15, 2003)...............................................3

**<u>Miscellaneous</u>**

Department of Labor, Comprehensive B-Reader List (Apr. 4, 2013), *available at*
  http://www.dol.gov/owcp/dcmwc/B-ReaderList.pdf .....................................30

International Labour Office, Guidelines for the Use of the ILO International
Classification of Radiographs of Pneumoconioses (rev. ed. 2011), *available at*
  http://www.ilo.org/wcmsp5/groups/public/@ed_protect/@protrav/@safewor
  k/documents/publication/wcms_168260.pdf.................................................13

NIOSH B Reader Program, *available at*
  http://www.cdc.gov/niosh/topics/chestradiography/breader.html...................8

# I.  STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This matter involves an appeal from a final order of the United States Department of Labor Benefits Review Board ("Board") in a claim under the Black Lung Benefits Act ("BLBA"), 30 U.S.C. §§ 901-945.  This Court has jurisdiction over an appeal from a final order of the Board under Section 21(c) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 921(c), as incorporated by § 422(a) of the BLBA, 30 U.S.C. § 932(a).  The Board affirmed the November 28, 2012 award of federal black lung benefits to William Dempsey by United States Department of Labor ("DOL") Administrative Law Judge ("ALJ") Michael P. Lesniak.  Joint Appendix ("JA") 806.

The jurisdictional time limit for filing an appeal from a final order of the Board is 60 days.  *See* 33 U.S.C. § 921(c); 20 C.F.R. § 725.482(a) (2012).  The Board issued its final order affirming the award of benefits to Mr. Dempsey on February 28, 2014.  JA 806.  Sewell Coal Company ("Sewell") filed its appeal with this Court on April 28, 2014.  JA 827.  The injury alleged, within the meaning of Section 21(c) of the LHWCA, occurred in West Virginia.  JA 807 n.5.  This Court has jurisdiction to review the Board's decision.

## II.   STATEMENT OF THE ISSUES

1.   **Did the ALJ err by discrediting physicians for relying on the medically accepted radiographic presentation of coal workers' pneumoconiosis to support their conclusions?**

2.   **Did the ALJ err by failing to weigh the x-ray evidence together with the medical opinion evidence and by not resolving conflicts in the radiographic evidence?**

3.   **Is the ALJ's analysis of the physicians' qualifications and credentials inconsistent and irrational?**

4.   **Are the ALJ's reasons for discrediting Dr. Renn's medical opinion irrational, unsupported by substantial evidence, and contrary to the applicable law?**

5.   **Are the ALJ's reasons for crediting the medical opinions of Drs. Rasmussen and Dr. Cohen irrational, unsupported by substantial evidence, and contrary to the applicable law?**

# III.   STATEMENT OF THE CASE

## A.    Procedural History

The case concerns a claim for federal black lung benefits filed by

William Dempsey ("Claimant") on February 8, 2001.[1]     JA 1.   The District

---

[1]      This claim is not affected by amendments to the BLBA in 2010, which apply only to claims filed after January 1, 2005, that are pending on or after March 23, 2010.   *See* Patient Protection and Affordable Care Act, Pub. L. No. 111–148, § 1556(c), 124 Stat. 119, 260 (2010).   Because this claim was filed after January 19, 2001, it is governed by 20 C.F.R. Parts 718 and 725.   *See* 20 C.F.R. §§ 718.2, 725.2.   The ALJ issued the decision in this claim on November 28, 2012 (JA 791), so all citations herein are to the 2012 edition of the Code of Federal Regulations.

The Department of Labor ("DOL") subsequently amended the regulations governing federal black lung proceedings in 2013 and 2014.   None of the regulations amended in 2013 affect this case.   *See* Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act: Determining Coal Miners' and Survivor' Entitlement to Benefits, 78 Fed. Reg. 59102, 59114-19 (Sept. 25, 2013). The 2014 amendments substantively changed the law by incorporating a new medical technology previously unaddressed by the regulations—digital x-rays.   *See* Black Lung Benefits Act: Standards for Chest Radiographs, 79 Fed. Reg. 21606, 21608 (Apr. 17, 2014) They also limited the amount of radiographic evidence a party may submit by redefining "x-ray" to include both analog and digital films. *Id.* at 21612 (amended 20 C.F.R. § 718.102).   The effective date of the amendments is May 19, 2014, and they contain no language regarding retroactive application.   *Id.* at 21606. An agency may not promulgate retroactive rules absent express congressional authority.   *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).   The Director has acknowledged that Congress did not expressly grant the DOL authority to promulgate retroactive regulations under the BLBA.   *See, e.g.,* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 68 Fed. Reg. 69930, 69932 (Dec. 15, 2003); 65 Fed. Reg. 79920, 79949 (Dec. 20, 2000).   Retroactive application of the 2014 regulatory amendments to this claim, filed prior to their effective date, would have a constitutionally impermissible retroactive effect and violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et seq.*

Director denied Mr. Dempsey's first application for benefits filed in 1989. JA 543. He filed his second claim for benefits on February 8, 2001. JA 1. The District Director awarded benefits in 2002, and forwarded the claim to the Office of Administrative Law Judges (OALJ) for a formal hearing at Sewell's request. JA 543.

ALJ Daniel L. Leland awarded benefits in 2003. JA 541. He held Mr. Dempsey timely filed his application for benefits because the three-year statute of limitations does not apply to subsequent claims. JA 553. The ALJ found the Claimant totally disabled from the respiratory standpoint. JA 556. In weighing the evidence as to the existence of pneumoconiosis, the ALJ discredited Dr. Jerome Wiot's x-ray interpretations. *Id.* Dr. Wiot concluded Mr. Dempsey had idiopathic pulmonary fibrosis ("IPF")[2] and not pneumoconiosis, in part, because the disease process involved only the lower lung zones, which is inconsistent with coal workers' pneumoconiosis. *Id.* The ALJ found Dr. Wiot's conclusions contrary to the record. *Id.* The ALJ credited the opinions of Drs. Donald L. Rasmussen, Robert Cohen, Dominic Gaziano, and Mark Wantz, all of whom diagnosed pneumoconiosis and not IPF. JA 557–58. The ALJ discredited the assessment of

---

[2]  Idiopathic pulmonary fibrosis ("IPF") is also known as usual interstitial pneumonitis ("UIP"). JA 94-95, 362.

Dr. Joseph Renn, who diagnosed IPF and not pneumoconiosis, as based on evidence not in the record, equivocal, and contrary to the x-ray evidence. JA 559.

Sewell appealed to the Board, which issued an en banc decision vacating the benefits award on June 28, 2004. JA 637. The Board affirmed the finding that the statute of limitations does not apply to a subsequent claim. JA 639-40. The Board rejected arguments against the regulations' evidence limitations, but held the ALJ erroneously applied those limitations to the CT-scan evidence. JA 642–44. The Board also agreed the ALJ erroneously rejected certain treatment records. JA 644–50. The Board affirmed the finding that the x-ray evidence established pneumoconiosis; upheld the crediting of the opinions of Drs. Rasmussen, Cohen, Gaziano, and Wantz; and vacated the rejection of Dr. Renn's opinion. JA 650–52.

On remand in 2005, ALJ Leland admitted into the record additional treatment records and Dr. Harold Spitz's interpretation of a CT scan diagnosing IPF. JA 658–59. The ALJ then awarded benefits. JA 656. He again found Dr. Renn's assessment entitled to little weight and contrary to the x-ray evidence of record, which the ALJ concluded revealed opacities in all lung zones. JA 660. The ALJ again credited the opinions of Drs. Cohen, Rasmussen, Gaziano, and Wantz in finding the existence of pneumoconiosis and total disability due to pneumoconiosis. JA 661–63.

Sewell again appealed to the Board, and a majority affirmed the award of benefits on March 31, 2006. JA 667. The majority held the ALJ properly analyzed the CT-scan evidence, did not err in excluding certain medical testing records, and did not selectively weigh the physicians' opinion evidence. JA 671–75. Administrative Appeals Judge Boggs concurred in part and dissented in part. JA 676. She concluded the ALJ improperly weighed Dr. Renn's and Dr. Cohen's opinions by focusing on the number of inadmissible exhibits reviewed instead of the impact of those exhibits on the physicians' opinions. JA 676–77. Judge Boggs also believed the ALJ erred in finding Dr. Renn's conclusion, that the x-ray changes do not represent pneumoconiosis because the upper lung zones are clear, contrary to the record because other physicians' x-ray interpretations also showed no opacities in the upper lung zones. JA 677.

Sewell then appealed to this Court, which vacated the benefits award on April 22, 2008. JA 696. The Court held the three-year statute of limitations applies to subsequent claims, and therefore, remanded for a determination of whether Mr. Dempsey timely filed his claim. JA 699–700.

On second remand in 2008, ALJ Leland held the claim was timely filed and again awarded benefits. JA 703. The Board affirmed the timeliness finding on November 25, 2009. JA 705. Sewell appealed, and on May 19, 2011, this Court affirmed the timeliness finding but remanded the claim for reconsideration of the

6

medical evidence. JA 739. The Court directed the ALJ to reconsider Dr. Renn's and Dr. Cohen's opinions and to determine whether they are based in any material part on inadmissible evidence. JA 738–39. The Court held that in analyzing the x-ray evidence, the ALJ incorrectly placed controlling weight on which party's viewpoint found more supporters. JA 738 n.6. The Court found the ALJ failed to explain why he gave more weight to Dr. Michael Alexander's and Dr. Manu Patel's x-ray readings than to Dr. Wiot's. *Id.* The Court directed the ALJ to reweigh the evidence and determine whether it supports finding pneumoconiosis and disability causation. *Id.*

Because of ALJ Leland's retirement, the case was reassigned to ALJ Michael P. Lesniak on remand. JA 792. Mr. Dempsey passed away March 11, 2012, and his spouse pursued the claim on behalf of the estate. JA 807 n.2. ALJ Lesniak awarded benefits on November 28, 2012. JA 791. He credited the interpretations of Drs. Alexander and Patel, who attributed the x-ray opacities to coal workers' pneumoconiosis, over those of Drs. Wiot and Paul Wheeler, who attributed the opacities to IPF. JA 797–98. The ALJ believed Dr. Wiot's opinion, that coal workers' pneumoconiosis nodules begin in the upper lung zones and appear primarily small and rounded, "runs contrary to the premise underlying the Regulations, which do not require a finding of primarily rounded opacities in the upper lung zones to support a finding of pneumoconiosis." JA 797.

7

The ALJ gave Dr. Wheeler's x-ray interpretation less weight because the ALJ did not believe Dr. Wheeler was a B-reader[3] when he interpreted the x-ray.  JA 798.

Based on supplemental reports submitted on remand, the ALJ concluded neither Dr. Renn nor Dr. Cohen relied on inadmissible evidence in reaching their opinions.  JA 799.  The ALJ credited Dr. Cohen, who diagnosed clinical coal workers' pneumoconiosis.[4]  The ALJ concluded Dr. Cohen: (1) had superior credentials; (2) rendered a coal workers' pneumoconiosis diagnosis consistent with Dr. Rasmussen's and Dr. Gaziano's findings and with the ALJ's conclusions; and (3) correctly believed the Claimant's x-rays lacked classic IPF features.  JA 801–02.  The ALJ gave little weight to Dr. Renn, who diagnosed IPF.  JA 795, 800–01. He found Dr. Renn: (1) improperly focused on the shape and location of the x-ray opacities; (2) did not explain how he could diagnose IPF without a biopsy; (3) employed circular reasoning; and (4) made comments conflicting with

---

[3]     B-readers are doctors who pass an examination administered by the National Institute for Occupational Safety and Health ("NIOSH"), a federal agency operating under the United States Centers for Disease Control and Prevention. *See generally* NIOSH B Reader Program, *available at* http://www.cdc.gov/niosh/ topics/chestradiography/breader.html (last visited July 8, 2014). B-Reader approval is granted to physicians with a valid medical license who demonstrate proficiency in the classification of chest radiographs for pneumoconioses using the International Labour Office ("ILO") Classification System. *Id.*

[4]     ALJ Lesniak also adopted ALJ Leland's reasoning by crediting the opinions of Drs. Rasmussen and Gaziano.  JA 801–02.

Dr. Rasmussen. JA 800–01. The ALJ thus found the x-ray and medical opinion evidence established pneumoconiosis.[5] JA 798, 802. The ALJ also attributed disability to pneumoconiosis based on Dr. Rasmussen's and Dr. Cohen's opinions. JA 802–03.

Sewell again appealed and the Board affirmed the award of benefits by split decision on February 28, 2014. JA 806. Regarding the x-ray evidence, the majority held the ALJ properly (1) declined to accord greater weight to Drs. Wiot and Wheeler's x-ray readings based on their credentials; (2) gave less weight to Dr. Wiot's readings because his comments that coal workers' pneumoconiosis "invariably begins in the upper lung fields and most often is of a rounded opacity" undercut the readings' probative value because "the Department of Labor does 'not require a finding of primarily rounded opacities in the upper lung zones to support a finding of pneumoconiosis'"; (3) gave Dr. Wheeler's x-ray reading less weight because he was not a B-reader at the time of his x-ray interpretation; and (4) declined to give less weight to Drs. Alexander's and Patel's x-ray readings for not explaining their conclusions. JA 809–13.

---

[5]    ALJ Lesniak also gave little weight to Dr. Wantz's opinion, as Dr. Wantz analyzed little medical evidence and his credentials were not in the record, and gave little weight to the opinions of Drs. J. David Brown and the West Virginia Occupational Pneumoconiosis Board for the reasons given by ALJ Leland. JA 799.

9

The Board's majority opinion also held ALJ Lesniak properly: (1) incorporated ALJ Leland's findings regarding the opinions of Drs. Rasmussen, Gaziano, and John A. Bellotte; (2) found Dr. Cohen provided a reasoned and documented opinion consistent with the ALJ's finding of clinical pneumoconiosis; and (3) gave proper consideration to the CT-scan evidence.  JA 813, 815–16.  The majority further held the ALJ properly discredited Dr. Renn's opinion because: (1) like Dr. Wiot, Dr. Renn opined coal workers' pneumoconiosis begins in the upper lung zones and presents primarily as small rounded opacities; (2) it was unclear how Dr. Renn could categorize the lung disease as being in an early stage; (3) Dr. Renn relied on circular reasoning to conclude Mr. Dempsey had IPF; and (4) it was "nonsensical" to attribute the lung condition to a disease of unknown origin like IPF when Mr. Dempsey had a lengthy coal mine dust exposure. JA 813–15.

Judge Boggs dissented.  She concluded the ALJ erred in rejecting Dr. Wiot's and Dr. Renn's IPF diagnoses because of their reliance on the radiographic presentation of pneumoconiosis, in which opacities begin in the upper lung zones and appear primarily small and rounded.  *See* JA 817–21.  Judge Boggs noted the regulations define "clinical pneumoconiosis" as a medical matter, meaning a physician may use the medically accepted presentation of coal workers'

pneumoconiosis to diagnose its presence or indicate its absence.[6] *See* JA 818–21. Judge Boggs also found the ALJ erred by accepting Dr. Alexander's positive x-ray reading without weighing it against Dr. Wiot's contrary reading and by failing to weigh Dr. Wiot's conclusions against the medical opinion evidence. JA 820 n.17.

In addition, Judge Boggs found the ALJ erred in concluding that Dr. Renn used circular reasoning and that Dr. Renn inadequately explained why Mr. Dempsey survived IPF for over 30 years. JA 821–22. Judge Boggs also found the ALJ mischaracterized Dr. Renn's reasoning in finding the physician failed to explain how he diagnosed IPF without a biopsy, because Dr. Renn only testified he could not identify which type of IPF was present without a biopsy. JA 823 n.22. Finally, Judge Boggs determined the ALJ rendered inconsistent findings when considering the physicians' qualifications. JA 824–25.

Sewell timely appealed the Board's decision to this Court on April 28, 2014. JA 827.

---

[6]    "Clinical pneumoconiosis" is defined as "those diseases recognized by the medical community as pneumoconiosis, i.e., the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment."    20 C.F.R. § 718.201(a)(1) (2012).    "Legal pneumoconiosis," by contrast, "includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment."  20 C.F.R. § 718.201(a)(2) (2012).    Only the presence or absence of clinical pneumoconiosis is at issue because the ALJ made no finding regarding legal pneumoconiosis.

## B.     Relevant Facts

William Dempsey worked as a coal miner for approximately 23 years. JA 543. He last worked as an above-ground dispatcher until 1989, and before that, underground as a belt repairman from 1971 until 1982. *See* JA 1, 5, 543, 698.

The record contains numerous x-ray and CT-scan interpretations taken between 1976 and 2002. All of the physicians who interpreted the radiographic evidence found an interstitial lung disease; they differ regarding whether the etiology of that disease is coal workers' pneumoconiosis or IPF. If the latter disease is the cause, Mr. Dempsey is not entitled to black lung benefits.

Of the six physicians who hold the dual certifications of board-certified radiologist and B-reader, Drs. Wiot, Spitz, Wheeler, and John Scatarige all found the radiographic evidence inconsistent with coal mine dust-induced lung disease. Rather, they found the x-rays and CT-scans consistent with IPF. JA 155, 192, 274, 275, 279, 281-82, 287. Dually-certified[7] physicians Drs. Alexander and Patel interpreted the x-rays as consistent with clinical coal workers' pneumoconiosis. JA 189-90, 194, 278. Of all these physicians, only Dr. Alexander interpreted the CT scan as consistent with coal workers' pneumoconiosis. CE 2.

---

[7]     A "dually-certified" or "dually-qualified" physician refers to a doctor who is a board-certified radiologist and a certified B-reader. *See supra* n.3.

Dr. Wiot, professor of radiology at the University of Cincinnati, helped write the standards for the ILO classification system for radiographic pneumoconiosis.[8] *See* JA 343–51. He was recognized as a C-reader, a designation assigned to only a few radiologists who have eminent familiarity with the ILO classification system. JA 346–48. Dr. Wiot testified the x-rays and CT scans revealed no evidence of coal workers' pneumoconiosis. JA 368. The upper lung fields, where coal workers' pneumoconiosis would be expected to start, were clear. JA 352, 368. He explained the presentation of the x-ray opacities is characteristic of IPF. JA 362–63. Dr. Wiot testified no association exists between IPF and coal mine dust exposure. JA 362.

Dr. Bellotte, board-certified in internal medicine and pulmonary disease and a NIOSH-certified B-reader, examined the Claimant. JA 127. Dr. Bellotte found

---

[8]    The "ILO classification system" refers to the International Labor Organization's International Classification of Radiographs of the Pneumoconioses, a system for interpreting chest x-rays and classifying them for the degree of pneumoconiosis present. *See* 20 C.F.R. § 718.102 (2012). The ILO classification system uses a 12–step scale to measure the concentration of opacities (*i.e.*, areas of darkness or shading) on chest x-rays. *Id.* Chest x-rays classified as category 0–, 0/0, or 0/1 are negative for pneumoconiosis. *Id.* An ILO rating of 1/0 or greater is evidence of pneumoconiosis. *Id.* The ILO system also requires the physician to specify the shape of any opacities seen as: p, q, or r (rounded opacities) or s, t, or u (irregular opacities). *See* International Labour Office, Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses (rev. ed. 2011), *available at* http://www.ilo.org/wcmsp5/groups/public/@ed_protect/@protrav/@safework/documents/publication/wcms_168260.pdf (last visited July 8, 2014); *see also, e.g.*, JA 156 (example of an ILO classification form).

the x-rays and objective studies consistent with IPF, which is not caused by coal mine dust. JA 94–95. He found no evidence of coal workers' pneumoconiosis. JA 95. He concluded the Claimant was not totally disabled from the respiratory or pulmonary standpoint. *See* JA 130.

Dr. Renn, board-certified in internal medicine and pulmonary disease and a NIOSH-certified B-reader, examined the Claimant and authored a supplemental report after reviewing additional records. JA 234, 531. Dr. Renn concluded the Claimant does not have coal workers' pneumoconiosis, but has IPF, unrelated to coal mine dust. JA 432. Dr. Renn attributed the gas exchange impairment to IPF. *Id.* Dr. Renn also provided a supplemental report indicating he based his conclusions only on the admissible evidence. JA 743-44.

Dr. Rasmussen, board-certified in internal medicine, examined the Claimant at the DOL's request. JA 157. He diagnosed coal workers' pneumoconiosis based on "26+ years coal mine employment and x-ray evidence of pneumoconiosis." JA 160. Dr. Rasmussen admitted IPF could not be excluded. JA 320–21. He believed Mr. Dempsey has a totally disabling pulmonary or respiratory impairment due to coal workers' pneumoconiosis. JA 163.

Dr. Cohen reviewed medical records and authored a consultative report. JA 458. Unlike Dr. Renn, Dr. Cohen did not examine Mr. Dempsey. Dr. Cohen concluded Mr. Dempsey has coal workers' pneumoconiosis, not IPF. JA 464. He

opined Mr. Dempsey is totally disabled due to a coal workers' pneumoconiosis-induced gas exchange impairment. JA 468. Dr. Cohen also provided a supplemental report indicating he based his conclusions only on the admissible evidence. JA 745–47.

The Claimant's treating physician, Dr. Gaziano, authored several brief reports. JA 34–37, 53, 55, 336. He believed Mr. Dempsey had coal workers' pneumoconiosis, not IPF, and gave no opinion on whether Mr. Dempsey was totally disabled from the pulmonary or respiratory standpoint. JA 336.

Dr. Wantz, who provided the DOL examination for Mr. Dempsey's initial black lung claim, and Dr. Brown, who wrote the state board of rehabilitation on Mr. Dempsey's behalf, diagnosed coal workers' pneumoconiosis. JA 40–43, 56– 58, 60. Dr. Brown attributed total disability to coal workers' pneumoconiosis. JA 56–58. Dr. Wantz gave no opinion on total disability or its etiology. JA 40-43.

## IV.    SUMMARY OF ARGUMENT

The physicians agree the Claimant has a pulmonary disease, but they differ regarding its etiology–clinical coal workers' pneumoconiosis or IPF.  "Clinical pneumoconiosis" is defined as "those diseases recognized by the *medical community* as pneumoconiosis."   20 C.F.R. § 718.201(a)(1) (2012) (emphasis added).   Yet, in finding the existence of clinical pneumoconiosis, the ALJ discredited Drs. Wiot and Renn because they relied on the medically-accepted radiographic presentation of coal workers' pneumoconiosis to support their conclusions that the Claimant does not have that condition.  *See* JA 797-98, 800. The ALJ held these physicians' opinions that coal workers' pneumoconiosis nodules begin in the upper lung zones and appear primarily as rounded opacities, "runs contrary to the premise underlying the Regulations."  JA 797.  The ALJ erred because, based on the plain language of the regulation, whether the Claimant had clinical pneumoconiosis depends on whether he had a disease recognized by the "medical community" as pneumoconiosis.  Thus, a physician cannot be discredited for relying on the medically-accepted presentation of that disease to determine its presence or absence.

The ALJ erred by summarily crediting Dr. Alexander's x-ray interpretations over Dr. Wiot's interpretations without resolving conflicts between their opinions. He also failed to weigh the radiographic evidence together with the physicians'

16

opinion evidence as required by this Court's precedent. *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 211 (4th Cir. 2000).

The ALJ inconsistently and irrationally credited the various physicians' qualifications in determining what weight to accord their opinions. He valued research and publications inconsistently by choosing to recognize them with regard to Dr. Cohen, but not with regard to Drs. Wiot and Wheeler. JA 800. The ALJ also errantly found Dr. Rasmussen's pulmonology credentials equaled Dr. Renn's qualifications. *Id.* Unlike Dr. Renn, however, Dr. Rasmussen is not a board-certified pulmonologist. *Id.* at n.13.

The ALJ's reasons for discrediting Dr. Renn's medical opinion are irrational and not supported by the record. The ALJ mischaracterized Dr. Renn's reasoning in finding that Dr. Renn failed to explain how he definitively diagnosed IPF without a confirmatory biopsy. JA 800. Dr. Renn, however, explained a biopsy is necessary to determine *which* of the four types of IPF is present, but was not needed to conclude the Claimant has one of those four types. *See* JA 404-05, 432-33. In rejecting Dr. Renn's assessment, the ALJ also errantly assumed that all persons with IPF have a short life expectancy. JA 800. The ALJ made this assumption without analyzing the credibility of Dr. Renn's explanation, supported by medical studies, that this is not true. JA 536. Dr. Renn explained that studies show IPF and longevity co-exist where certain characteristics are present, and the

17

Claimant fits the profile of an IPF patient who would be expected to lack the disease's ordinarily reduced survival rate. *Id.*

The ALJ's reasons for crediting the medical opinions of Drs. Rasmussen and Cohen are irrational, unsupported by substantial evidence, and contrary to the applicable law. Dr. Rasmussen's opinion is poorly reasoned and not well documented. *See* JA 157, 288, 455. Dr. Cohen's opinion is undermined by his shift of the burden of proof. Dr. Cohen argued "[t]he presence of irregular opacities in no way rules out coal workers' pneumoconiosis." JA 747. As the 15-year presumption does not apply in this claim, Sewell does not have the burden of "ruling out" coal workers' pneumoconiosis. Rather, the Claimant has the burden to prove his condition is due to coal mine dust exposure.

For these reasons, the Board's decision should be vacated and remanded for reconsideration by the ALJ. Whether the Claimant had coal workers' pneumoconiosis and was entitled to benefits, or instead had non-compensable IPF, must be determined by an evidentiary analysis that complies with the law.

# V.   ARGUMENT

## A.   STANDARD OF REVIEW

In reviewing claims for benefits under the BLBA, this Court determines whether substantial evidence supports the findings of fact issued by the ALJ. *Dehue Coal Co. v. Ballard*, 65 F.3d 1189, 1193 (4th Cir. 1995).   Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938); *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 529 (4th Cir. 1998).   In determining whether substantial evidence supports the ALJ's factual determinations, the Court should address whether all relevant evidence has been analyzed and whether the ALJ has sufficiently explained the rationale used in crediting certain evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439 (4th Cir. 1997).

The ALJ's and Board's conclusions of law are reviewed *de novo* to determine if they are rational and consistent with the law. *See Ballard*, 65 F.3d at 1193; *see also Compton*, 211 F.3d at 207–08.

19

**B.    DISCUSSION OF ISSUES**

**1.    The ALJ erred by discrediting physicians for relying on the medically accepted radiographic presentation of coal workers' pneumoconiosis to support their conclusions.**

The ALJ found the x-ray and medical opinion evidence established clinical coal workers' pneumoconiosis.  JA 798, 802.  "Clinical pneumoconiosis" is defined as "those diseases recognized by the medical community as pneumoconiosis."   20 C.F.R. § 718.201(a)(1) (2012); *see supra* n.6.  In finding clinical pneumoconiosis, the ALJ discounted Dr. Wiot's and Dr. Renn's medical conclusions as contrary to premises underlying the black lung regulations. JA 797-98, 800.  The ALJ's analysis of Dr. Wiot's and Dr. Renn's assessments is irrational, unsupported by substantial evidence, and contrary to law.

Drs. Wiot and Renn found the existence of IPF rather than coal workers' pneumoconiosis in part by comparing the recognized radiographic presentation of coal workers' pneumoconiosis's to the Claimant's x-rays.  Dr. Wiot interpreted three x-rays and one CT scan.  *See* JA 155, 274, 275, 279; *see also* JA 352–54, 361-65.  He concluded the radiographic evidence failed to show evidence of any coal-mine-dust-induced lung disease.   *Id.*   He explained coal workers' pneumoconiosis begins in the upper lung zones and ordinarily presents as small, rounded opacities on x-ray.  JA 352, 371-74.  The Claimant's x-ray showed clear upper lung fields with irregular-shaped opacities, rather than rounded opacities, in

20

the lower lung zones making the presentation more characteristic of IPF than coal workers' pneumoconiosis. *See* JA 352–54, 362, 368, 371–73. Similarly, Dr. Renn concluded the radiographic pattern and clinical presentation were not typical for coal workers' pneumoconiosis, but were consistent with IPF. JA 403–04, 416–17. He explained that x-rays showed small irregular-shaped opacities in the mid and lower lung zones, but none in the upper lung zones. JA 259, 403. Dr. Renn testified that the medical literature establishes such a radiographic presentation is inconsistent with coal workers' pneumoconiosis, but is consistent with IPF. *See* JA 403–04. He also reported that no association exists between IPF and coal mine dust. JA 362, 417.

The ALJ found Dr. Wiot's and Dr. Renn's reliance on the characteristics of the radiographic presentation of coal workers' pneumoconiosis rendered their opinions "contrary to the premise underlying the Regulations, which do not require a finding of primarily rounded opacities in the upper lung zones to support a finding of pneumoconiosis." JA 797, 800. As Judge Boggs explained in her dissent, the ALJ erred by failing "to recognize that he was considering the x-ray interpretation and physician's opinions under 20 C.F.R. § 718.202 for the purpose of determining whether claimant has 'clinical pneumoconiosis' as defined under 20 C.F.R. § 718.202(a)(1). The language of that provision makes *clinical*

21

*pneumoconiosis* a medical matter." JA 818–19 (footnote omitted). Judge Boggs explained:

> Based on the plain language of the regulation, resolution of the issue of whether claimant had clinical pneumoconiosis depends on whether he had a disease recognized by the *medical community* as pneumoconiosis. The regulations list "coal workers' pneumoconiosis," as one disease fitting the definition, i.e., recognized by the medical community as pneumoconiosis. The contours of what constitutes "coal workers' pneumoconiosis," consequently, is defined medically. Thus, when addressing whether a claimant has coal workers' pneumoconiosis, a physician is not precluded from using the medically accepted presentation and progression of that disease to diagnose its presence, or to indicate its absence.

JA 819–20 (Boggs, J., dissenting) (footnote omitted). Therefore, contrary to the ALJ's determination, the reliance by Drs. Wiot and Renn on the medically-accepted radiographic presentation of coal workers' pneumoconiosis is not contrary to the regulations, but is pertinent to determining whether the Claimant had clinical pneumoconiosis. *Id.* at 821 .

By refusing to weigh Dr. Wiot's and Dr. Renn's expert knowledge of the radiographic presentation of pneumoconiosis and instead discrediting them for applying such knowledge, the ALJ impermissibly substituted his own opinion for that of the medical experts as to the diagnostic meaning of the medical data. *See Hicks*, 138 F.3d at 533 (ALJ not permitted to substitute his untrained opinion for that of qualified expert). While the regulations allow that certain changes could be deemed pneumoconiosis, when an expert explains changes are *not* pneumoconiosis

or coal mine dust-related, the fact-finder cannot rely on the general criteria over a specific expert's opinion.

The physicians essentially agree that the radiographic presentation of clinical coal workers' pneumoconiosis most often consists of upper-lung-zone rounded opacities, and in only a minority of cases will the disease consist of irregular or lower-lung-zone opacities. *See* JA 306-07 (Dr. Rasmussen); JA 464, 467, 747 (Dr. Cohen); JA 336 (Dr. Gaziano); JA 352-53, 357, 371-73 (Dr. Wiot); JA 385, 403, 422-23, 437-38 (Dr. Renn). The Claimant's own medical expert, Dr. Cohen, relied upon an article which asserts: "The most common radiographic abnormality in simple CWP consists of small rounded opacities located predominantly in the upper zones of the lungs." JA 749.

Contrary to the ALJ's finding, Dr. Wiot's and Renn's reliance on the presence of clear upper lung zones and irregular-shaped opacities to conclude the miner had IPF rather than coal workers' pneumoconiosis is consistent with the medical community's understanding of clinical coal workers' pneumoconiosis, and therefore, with the regulatory definition of the disease. *See* 20 C.F.R. § 718.202(a)(1) (2012). The Claimant bears the burden to prove his condition, the presentation of which falls outside the medically accepted norms for the diagnosis of coal workers' pneumoconiosis, is caused by coal mine dust exposure. *See Director, OWCP v. Greenwich Collieries*, 512 U.S. 267, 277–78 (1994) (claimant

23

has the burden of proving every element of entitlement by a preponderance of the evidence).  It is not Sewell's burden to prove the opposite.

The ALJ holds in essence that medical experts cannot use established medical knowledge about the predominant characteristics of coal workers' pneumoconiosis' to support their conclusions that the Claimant does not have the condition.  *See* JA 797-98, 800.  Such a finding is irrational and contrary to law.  Neither the regulations nor the preamble require a physician to ignore medically accepted facts regarding the radiographic presentation of coal workers' pneumoconiosis in forming their conclusions.  As the ALJ misapplied the law, the benefits award should be vacated and remanded for reassessment of the x-ray and medical opinion evidence to determine whether the Claimant has carried his burden to prove he has a disease recognized by the medical community as coal workers' pneumoconiosis.

**2.    The ALJ erred by failing to weigh the x-ray evidence together with the medical opinion evidence and by not resolving conflicts in the radiographic evidence.**

The x-ray interpretations by Drs. Wiot and Alexander differed markedly. *Compare* JA 275 (Dr. Wiot interprets October 25, 2002 x-ray as negative for coal workers' pneumoconiosis) *with* JA 278 (Dr. Alexander interprets October 25, 2002 x-ray as positive for coal workers' pneumoconiosis, 2/1 profusion and p/s-shaped opacities).[9]  The ALJ "did not consider the variations in the observations as to the shape and location of the opacities in making his findings or conclusions."  JA 820 n.17 (Boggs, J., dissenting).  Rather, the ALJ "simply accepted Dr. Alexander's positive reading and did not attempt to resolve the conflict in the x-ray evidence by specifically weighing Dr. Wiot's contrary opinion, even though the physicians were addressing the same issue — the presence or absence of coal workers' pneumoconiosis, as seen on x-ray.  This was error."  *Id.*  Summarily accepting one interpretation over the other does not satisfy the ALJ's duty under the Administrative Procedure Act ("APA") to resolve all disputed issues of fact.  *See* 5 U.S.C. § 557(c)(3)(A).

The ALJ also erred by failing to weigh the x-ray evidence and the medical opinion evidence together.  *See* JA 796-802.  This Court's precedent requires that

---

[9]    *See supra* n.8 (explaining the x-ray classification system adopted by the federal black lung regulations).

25

separate categories of evidence, such as x-rays and medical opinions, be weighed together to determine whether coal workers' pneumoconiosis is established by a preponderance of the evidence. *Compton*, 211 F.3d at 207-08. As Judge Boggs explained, "Dr. Wiot's x-ray interpretation and his explanation as to why claimant did not have coal workers' pneumoconiosis were relevant to the credibility of the medical opinion evidence at 20 C.F.R. § 718.202(a)(4)," and Dr. Wiot's opinion "should have been weighed . . . in determining whether the evidence, as a whole, established the existence of clinical pneumoconiosis, consistent with the Fourth Circuit's directive in *Island Creek Coal Co. v. Compton* . . . that all of the evidence on the issue be weighed together." JA 820-21 n.17 (Boggs, J, dissenting).

Dr. Wiot's x-ray interpretations and explanation of IPF's radiographic presentation supports the medical opinions diagnosing IPF and undermines the medical opinions diagnosing coal workers' pneumoconiosis. As the medical opinions rested in large part on the radiographic characteristics of pneumoconiosis versus IPF, it is critical to assess the credibility of the medical opinions by weighing them against Dr. Wiot's x-ray findings and testimony. *See Compton*, 211 F.3d at 207-08. Because the ALJ failed to weigh the different categories of evidence together, the ALJ's decision should be vacated and remanded for reconsideration of the medical evidence in a manner consistent with law.

### 3.    The ALJ's analysis of the physicians' qualifications and credentials is inconsistent and irrational.

In finding the x-ray evidence established coal workers' pneumoconiosis, the ALJ erred by declining without explanation to assign greater weight to Dr. Wiot's and Dr. Wheeler's x-ray readings in light of their radiology credentials. Regarding Dr. Wiot, the ALJ stated only, "Employer urges me to give great weight to this interpretation, considering Dr. Wiot's superior qualifications in the area of radiology. However, I decline to give his interpretation additional weight above that of any other dually-qualified physician, as is my prerogative." JA 797 (internal citation omitted). Such conclusory statements fail to satisfy the APA's requirement of reasoned decision- making. *See* 5 U.S.C. § 557(c)(3)(A); *see also Barren Creek Coal Co. v. Witmer*, 111 F.3d 352, 354 (3d Cir. 1997) ("The absence of explanation in certain portions of the ALJ's Decision and Order renders meaningful review impossible by this court, as we are unable to determine the analytic process behind the result.").

Similarly, the ALJ "decline[d] to give the opinion of Dr. Wheeler additional weight on the basis of his professorship, pursuant to the above." JA 798 n.7. But in considering the medical opinion evidence, the ALJ inconsistently gave greater weight to Dr. Cohen's opinion based on his research and publications. *See* JA 800 ("However, I find that the qualifications of Dr. Cohen exceed those of Dr. Renn; not only is he a board-certified pulmonologist who sees black lung patients, but he

27

also has researched and published extensively in the area of occupational disease."). The ALJ's analysis of the physicians' qualifications and credentials is irrational and arbitrarily selective.

As Judge Boggs explained in her dissent, the ALJ "has valued research and publications inconsistently by choosing to recognize them with regard to Dr. Cohen, but not with regard to Drs. Wiot and Wheeler." JA 824. An ALJ must consider the qualifications of the physicians that present radiographic evidence. 20 C.F.R. § 718.202(a)(1) (2012); *Hicks*, 138 F.3d at 536. The ALJ must also meaningfully explain the reasoning for the findings reached to comply with the APA. *See* 5 U.S.C. § 557(c); *Gunderson v. U.S. Dep't of Labor*, 601 F.3d 1013, 1022–23 (10th Cir. 2010). While the agency accords the fact-finder discretion, it is not unfettered discretion. The ALJ's disparate treatment of relevant medical evidence is impermissible. *See Freeman United Coal Mining Co. v. Stone*, 957 F.2d 360, 362–63 (7th Cir. 1992); *Pancake v. AMAX Coal Co.*, 858 F.2d 1250, 1255 (7th Cir. 1988) (an ALJ may not selectively analyze the record).

The ALJ failed to explain why it is rational to accord greater weight based on a physician's publications to Dr. Cohen but not to Drs. Wiot and Wheeler, and none is apparent from the record. Dr. Wiot was a professor of radiology for years and served as the director of the University Hospital Department of Radiology and the chairman of the University of Cincinnati Medical Center's Department of

28

Radiology. Director's Exhibit 35 at 4. He was also president of the American Board of Radiology, the American College of Radiology, and the American Roentgen Ray Society, and was chairman of the American College of Radiology's Task Force on Pneumoconiosis. *Id.* at 5. Dr. Wiot helped write the ILO classification system's standards, used to classify the existence of radiographic pneumoconiosis. *See* JA 348. He was recognized as a C-reader, a designation assigned to only a few radiologists who have eminent familiarity with the ILO classification system. *See* JA 346–48; *see generally Alley v. Riley Hall Coal Co.*, 6 Black Lung Rep. (Juris) 1-376, 1-377 (Ben. Rev. Bd. 1983). He authored or co-authored approximately 50 radiology-related articles, and was one of only five from the United States and seventeen from the world to participate in the ILO's meetings that engendered the 2000 revisions to the ILO Classification of Radiographs of Pneumoconioses. JA 824 n.23; Director's Exhibit 31 at 7-12.

Dr. Wheeler is a Harvard- and Johns Hopkins-trained radiologist who has been an associate professor of radiology since 1974. *See* Employer's Exhibit 6 at 1. He has published over 40 peer-reviewed articles and textbook chapters, and has participated in numerous invited lectures on the subjects of radiology and computer reporting. *See id.* at 4–9; JA 824 n.23. Dr. Alexander, whose x-ray readings the ALJ credited, only served as an assistant professor of radiology and nuclear medicine for less than two years, and lists only six publications on his curriculum

29

vitae, none of which address coal workers' pneumoconiosis.   JA 824 n.23; Claimant's Exhibit 2 at 4.

Incorporating ALJ Leland's previous finding, ALJ Lesniak gave Dr. Wheeler's reading of the August 13, 2001 x-ray less weight on the erroneous belief that Dr. Wheeler was not a certified B-reader when he read the x-ray.  *See* JA 798; *see also* JA 545 n.5.   This is prejudicial factual error.   While Dr. Wheeler's curriculum vitae does not indicate whether his B-reader certification was current when he read the x-ray, the ILO form is explicitly identified as "Pneumoconiosis classification/B-reading." JA 192.  It was irrational for the ALJ to credit the nonspecific curriculum vitae over the ILO form Dr. Wheeler specifically completed for this claim, which attests that he performed a "B-Reading."  *Id.*   The ILO form's attestation is corroborated by the DOL's Comprehensive B-Reader List, which indicates Dr. Wheeler has been continuously certified as a B-reader since 1973.  *See* Department of Labor, Comprehensive B-Reader List at 353 (Apr. 4, 1013), *available at* http://www.dol.gov/owcp/dcmwc/B-ReaderList.pdf.

The Board's majority opinion found the ALJ "was under no obligation to refer to sources outside the record to ascertain Dr. Wheeler's radiological

credentials."[10] JA 811 n.9. But the ALJ must analyze the evidence that *is* in the record (*see* JA 192) and to do so in a consistent manner. 5 U.S.C. § 557(c)(3)(A). Here he failed to do so.

The ALJ credited Dr. Patel's positive reading of the August 13, 2001 x-ray over Dr. Wheeler's negative reading on the ground that Dr. Patel was a B-reader at the time of his reading and Dr. Wheeler was not. JA 798. But the record does not contain Dr. Patel's B-reader license indicating when Dr. Patel was a licensed B-reader. The only evidence that Dr. Patel was a B-reader at the time of his x-ray interpretation is a check-marked box at the bottom of the ILO form in which Dr. Patel answers "yes" as to whether he is a B-reader. *See* JA 190. For purposes of identifying the physician's B-reader status, the checkmarked "Yes" answer on Dr. Patel's x-ray form (JA 190) is no different from the "ILO-1980 Pneumoconiosis Classification/B-Reading" identification on the ILO form Dr. Wheeler completed (JA 192). If the ALJ used the x-ray form to determine

---

[10]      ALJ Lesniak has taken judicial notice of NIOSH's Comprehensive B-Reader List in other cases, further illustrating the arbitrariness of his failure to do so here. *See, e.g.*, *Stephenson v. Island Creek Coal Co.*, 2003-BLA-6405, slip op. at 7 n.3 (OALJ Mar. 10, 2006) (unpub.), *available at* http://www.oalj.dol.gov/Decisions/ ALJ/BLA/2003/STEPHENSON_BEN_L_v_ISLAND_CREEK_COAL_CO_2003 BLA06405_(MAR_10_2006)_074056_CADEC_SD.PDF; *Smouse v. Marsolino Coolspring Quarry*, *Inc.*, 2000-BLA-381, slip op. at 4 n.3 (OALJ Sept. 29, 2000) (unpub.), *available at* http://www.oalj.dol.gov/Decisions/ALJ/BLA/2000/smouse_ joseph_t_v_marsolino_coolspring_2000bla00381_(sep_29_2000)_153730_cadec_ sd.PDF.

Dr. Patel was then a B-reader, he should have done the same to determine whether Dr. Wheeler was a B-reader as well. Such disparate treatment of relevant medical evidence is impermissible. *See Stone*, 957 F.2d at 362–63; *Pancake*, 858 F.2d at 1255.

The ALJ also errantly found Dr. Rasmussen's pulmonology credentials equaled Dr. Renn's. JA 800 n.13. Unlike Dr. Renn, Dr. Rasmussen is not a board-certified pulmonologist. *Id.* This Court addressed the issue of an ALJ crediting a physician who is not board-certified in pulmonary medicine over one who is:

> First, the ALJ improperly discounted the respective qualifications of the physicians. Dr. Rasmussen is board-certified in only Internal Medicine, while Dr. Zaldivar is board-certified in both Internal Medicine and Pulmonary Disease. Although the ALJ noted the relative qualifications of the two physicians, he attributed no importance to the comparative credentials of the physicians, noting their respective qualifications were 'not dispositive of the issue.' (J.A. at 35.) We have previously stated that experts' respective qualifications are important indicators of the reliability of their opinions. *See Akers* at 440, 441, nn.1-2; *Adkins v. Director, OWCP*, 958 F.2d 49, 52 (4th Cir. 1992).

*Hicks*, 138 F.3d at 536. Dr. Rasmussen's opinion did not merit more weight than Dr. Renn's on the basis of the physicians' respective credentials. *Id.*; *see also Scott v. Mason Coal Co.*, 14 Black Lung Rep. (Juris) 1-37, 1-40 (Ben. Rev. Bd. 1990).

Finally, the ALJ erroneously considered Drs. Gaziano and Renn to be equally qualified in pulmonology. JA 800 n.13. "Specifically, Drs. Renn and

Gaziano are both board certified pulmonologists; the former treats a large number of coal miners, while the latter is a professor of respiratory therapy." *Id.* This finding ignores the fact that Dr. Renn is also a professor of medicine. JA 448. Such selective analysis of the evidence is prohibited. *See Stone*, 957 F.2d at 362–63; *Pancake*, 858 F.2d at 1255. The ALJ did not explain why he was unwilling to credit Dr. Wiot's and Dr. Wheeler's professorial credentials when he did so for Dr. Gaziano. The ALJ's analysis applies inconsistent standards to the medical opinions. *See id.*

The ALJ inconsistently and irrationally considered the physicians' credentials when analyzing the medical evidence. Given the importance of the physicians' relative credentials in determining the weight their opinions merit, the benefits award should be vacated and remanded for consideration of the credentials in a manner consistent with law.

**4.     The ALJ's reasons for discrediting Dr. Renn's medical opinion are irrational, unsupported by substantial evidence, and contrary to the applicable law.**

Based on an extensive examination of Mr. Dempsey, a careful consideration of testing results, and a comprehensive review of additional medical evidence, Dr. Renn concluded Mr. Dempsey had IPF and not coal workers' pneumoconiosis. JA 235-40, 377-453, 531-38, 743-44. The ALJ rejected Dr. Renn's opinion for several reasons which are irrational, not supported by the record, and are inconsistent with law.

First, the ALJ found Dr. Renn erred by relying on the predominant characteristics of pneumoconiosis's radiographic presentation to conclude what is seen on Mr. Dempsey's x-rays is not coal workers' pneumoconiosis, but IPF. JA 800. This finding is erroneous with respect to Dr. Renn for the same reasons it is erroneous regarding Dr. Wiot. *See supra* pp. 20-24.

Second, the ALJ discounted Dr. Renn's opinion in favor of Dr. Cohen's on the ground that Dr. Cohen's qualifications exceed those of Dr. Renn. JA 800. "[N]ot only is [Dr. Cohen] a board-certified pulmonologist who sees black lung patients, but he also has researched and published extensively in the area of occupational disease." *Id.* This depiction, however, almost exactly describes Dr. Renn as well: he too is a board-certified pulmonologist, he also sees black lung patients, and he has assisted with research in coal mine dust disease as a professor

34

of medicine. *See* JA 384–86, 448. The ALJ avoids noting Dr. Renn has more clinical-care experience with miners than Dr. Cohen as Dr. Renn's medical practice was located in the coal fields of Northern West Virginia and included many miners (JA 384, 386), while Dr. Cohen practices in Chicago, Illinois at a large urban medical center (Claimant's Exhibit 6). The problem with this rationale is the ALJ's inconsistent and selective use of physicians' credentials to assess their opinions. *See Stone*, 957 F.2d at 362–63; *Pancake*, 858 F.2d at 1255. The ALJ's willingness to rely on comparative medical credentials in some parts of his decision but not in others makes his credibility determinations arbitrary and irrational.

Third, the ALJ claimed Dr. Renn "did not adequately explain why miner has survived IPF for 30+ years, considering its short life expectancy" and instead employed "circular" reasoning to address this issue. JA 800–01. "Specifically, 'Dr. Renn is using [miner's] lack of one symptom of IPF (the decreased pulmonary function ratio) to prove his lack of another symptom of IPF (the decreased survival rate) . . . [whereas] the absence of both symptoms of [IPF] leads more directly to the conclusion that [miner] *does not have Idiopathic Pulmonary Fibrosis*.'" *Id.* The ALJ misunderstood or mischaracterized Dr. Renn's reasoning. As Judge Boggs explained in her dissent:

> Contrary to the administrative law judge's finding, Dr. Renn referenced the absence of both a reduced diffusion capacity and an

35

increased FEV1/FVC ratio in claimant to explain why claimant was not among those IPF patients with reduced survival, citing to a study for the proposition that a reduced survival was associated with these characteristics in patients diagnosed with IPF. However, he did not use the fact that claimant was still alive to then explain the absence of these characteristics. Rather, as employer suggests, using the study as support, Dr. Renn contended that claimant's survival was consistent with claimant's having IPF and not having either a reduced diffusion capacity or an elevated FEV1/FVC ratio. Dr. Renn acknowledged that, later in the course of the disease, claimant should have a restrictive ventilatory defect and interference with diffusion capacity, but suggested that claimant was in the early stages of IPF. In rejecting Dr. Renn's opinion, the administrative law judge assumed that all persons with IPF have a short life expectancy and decreased pulmonary function values. The administrative law judge made this assumption without analyzing the credibility of Dr. Renn's contention, supported by the study, that this is not the case.

JA 822–23; *see also* JA 822 n.20 (discussing the relied-upon study).

Dr. Renn does not use the lack of one IPF symptom to prove the lack of another. Rather, he uses studies to explain IPF and longevity co-exist where certain characteristics are present, and that the evidence thankfully shows the Claimant has those characteristics. Dr. Renn explained:

Schwartz et al. published a paper in 1994 titled "Determinants of Survival in Idiopathic Pulmonary Fibrosis." They found that an increased $FEV_1$/FVC ratio and decreased lung diffusion were all significantly associated with reduced survival. Mr. Dempsey's diffusing capacity studies of August 5 and October 1, 2002, are not valid. However, Dr. Rasmussen's diffusing capacity study of August 13, 2001, was apparently deemed to be valid. It was, at that time, minimally reduced. Additionally, the spirometry studies of August 5 and October 1, 2002, have not revealed an elevation of the

FEV$_1$/FVC ratio.  Thusly, by Schwartz et al., Mr. Dempsey's ventilatory function studies suggest that he is not an individual who would succumb rapidly to IPF.

JA 536.  And though the ALJ did not mention it, Dr. Renn also explained the Claimant's characteristics further match those from the Schwartz study:

> Further, the average age of the subjects that were studied by Schwartz et al. was 64 years with an age range of 25 to 83 of which 62% were male and 29% were never smokers.  Quite obviously, Mr. Dempsey's age of 65 places him almost exactly at the average age range of those with IPF.  Further, the ILO profusion categories of the study subjects' chest radiographs were 10% category zero, 32% category 1, 44% category 2 and 15% category 3.

*Id.*  Dr. Renn explained the Claimant fits the profile of an IPF patient who would be expected to lack the disease's ordinarily reduced survival rate.  *Id.*  It is not "circular" reasoning to apply the findings of scientific studies to a case's specific medical facts and arrive at conclusions consistent with those studies.

The ALJ also failed to consider all evidence on the issue of IPF's rate of progression.  *See* JA 822–23 n.21 (Boggs, J., dissenting).  Although Dr. Gaziano contended that if the Claimant had IPF, he "would likely have been dead or at least be severely impaired by this time," JA 336, Dr. Wiot testified consistently with Dr. Renn that IPF may develop either quickly or slowly, JA 356.  The ALJ failed to resolve these conflicts in the experts' opinions, in violation of the APA.  *See* 5 U.S.C. § 557(c)(3)(A).

Fourth, the ALJ seized on Dr. Renn's comment that IPF "is a presumptive diagnosis, based upon probabilities, but it is not proven until a lung biopsy is obtained by either open thoracotomy or video-assisted thoracotomy (VAT)." JA 536. The ALJ found Dr. Renn failed to explain how he definitively diagnosed IPF without a confirmatory biopsy. JA 800. The ALJ mischaracterized Dr. Renn's reasoning. *See* JA 823 n.22 (Boggs, J., dissenting). Dr. Renn explained four types of IPF are recognized pathologically:

> From everything that I had available to me and the finding that basically he had normal dynamic ventilatory function, he had normal lung volumes—but the radiographic pattern, I felt was consistent with pulmonary interstitial fibrosis. There are basically four types that are recognized pathologically. Those four types are—the usual one is called usual interstitial pneumonitis. There is desquamative interstitial pneumonitis. There's respiratory bronchiolitis, interstitial lung disease and nonspecific interstitial pneumonitis. And these are the basic—four basic pathologic categories. . . . And, so, actually, what Mr. Dempsey needed was someone to really look at him closely from a clinical standpoint and then do the appropriate procedures to determine what type of idiopathic pulmonary interstitial fibrosis that he has.

JA 404–05. Biopsy is necessary to determine *which* of the four types of IPF is present, but was not needed for Dr. Renn to conclude Mr. Dempsey has one of those four types of IPF:

> Q:     Pulmonary fibrosis is termed idiopathic only when all known causes of interstitial lung disease are ruled out; is that right?
>
> A:     Yes, it is because until you actually do the lung biopsy, you have no way of knowing which of the four major pathologic– which of the four pathologic categories the person may have.

38

> Now, in Mr. Dempsey, I think we can rule out respiratory bronchiolitis interstitial lung disease because that's found in smokers; but the other three, we can't rule out.

JA 438. Dr. Renn explained his reasons for concluding Mr. Dempsey had one of the four types of IPF. These reasons were unaffected by a lack of biopsy evidence.

Fifth, the ALJ noted Dr. Renn reported Mr. Dempsey's symptoms were incompatible with coal workers' pneumoconiosis "because you don't see interference with gas exchange this early in a coal mine induced disease unless you have a diffusing capacity that is much more severely impaired." JA 801 n.15. The ALJ deferred to Dr. Rasmussen's contrary view. *Id.* "Dr. Rasmussen, whom I find to be equally qualified, testified that a gas exchange impairment with exercise is a common manifestation of CWP." *Id.* Dr. Renn is a board-certified pulmonologist and Dr. Rasmussen is not—the two are not equally qualified regarding pulmonary matters. *See Hicks* 138 F.3d at 536 (error to credit Dr. Rasmussen over board-certified physician without explanation). Even if Drs. Renn and Rasmussen were equally qualified, there is no self-evident reason to defer to Dr. Rasmussen's view over Dr. Renn's. The ALJ provides no rationale for resolving the experts' conflicting opinions in favor of Dr. Rasmussen, and none is apparent. Simply picking one opinion over another without explanation is not reasoned decision-making.

Sixth, the ALJ accepted Dr. Cohen's criticism of Dr. Renn's IPF diagnosis—that the x-rays lacked classic features of IPF and it was "nonsensical" to attribute the lung condition to a disease of unknown origin where there was lengthy coal dust exposure as a possible origin. JA 801. Dr. Renn and radiologists Drs. Wiot, Wheeler, Scatarige, and Spitz all found Mr. Dempsey's radiographic presentation consistent with IPF and inconsistent with coal workers' pneumoconiosis. JA 155-56, 192, 240, 274-75, 279-82, 287, 352-57, 371-74, 385, 403-04, 416-17, 422-23, 437-38, 536-38.

The ALJ does not resolve the conflict between the physicians' opinions about the features of IPF; rather, he just defers to Dr. Cohen's belief that Mr. Dempsey lacked IPF's "classic" features. JA 801. Unexplained deference to one physician's view over a consensus of other physicians' views is not reasoned decision making. *See Allentown Mack Sales and Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). The ALJ and Dr. Cohen appear to assume Dr. Renn never considered coal mine dust as a potential cause of the x-ray opacities. Dr. Renn reasonably concluded, consistent with the radiologists' opinions, that the x-ray opacities did not arise from coal mine dust exposure. As there were no other possible origins for the opacities, Dr. Renn could only attribute the x-ray opacities to a disease of unknown origin, IPF. As Dr. Rasmussen even recognized, IPF cannot be excluded as a diagnosis in this case. JA 320–21. It is not "nonsensical"

for Dr. Renn to conclude, based on his expert interpretation of the medical evidence, that coal mine dust exposure was not the cause of the radiographic opacities.

Finally, the ALJ concluded he could not credit Dr. Renn's opinion on disability causation because Dr. Renn, unlike the ALJ, did not find the Claimant had coal workers' pneumoconiosis. JA 803. The ALJ's finding of clinical coal workers' pneumoconiosis suffers from prejudicial flaws and should be vacated. *See supra* pp. 20-26. As the ALJ's weighing of Dr. Renn's disability causation assessment was undermined by the ALJ erroneous finding of clinical pneumoconiosis, the ALJ should be required to reweigh Dr. Renn's analysis regarding disability causation.

Because none of the ALJ's reasons for rejecting Dr. Renn's opinions are rational, supported by substantial evidence, and consistent with law, the benefits award should be vacated and remanded for reconsideration of the evidence.

**5.    The ALJ's reasons for crediting the medical opinions of Drs. Rasmussen and Dr. Cohen are irrational, unsupported by substantial evidence, and contrary to the applicable law.**

The ALJ relied on the opinions of Drs. Rasmussen and Cohen to find the miner had clinical coal workers' pneumoconiosis and a totally disabling respiratory impairment due to pneumoconiosis. JA 801, 803. The ALJ's reasons for crediting these physicians' opinions are irrational, unsupported by substantial evidence, and contrary to law.

### a.    Dr. Donald L. Rasmussen

The ALJ erred in relying on Dr. Rasmussen's opinion because it is poorly reasoned and not well documented. Dr. Rasmussen relied on Dr. Patel's x-ray reading to diagnose coal workers' pneumoconiosis, even though Dr. Rasmussen admitted his own reading was more consistent with interstitial lung diseases (such as IPF). JA 305–07. Dr. Rasmussen agreed IPF could not be excluded as a diagnosis. JA 307, 320–21. Dr. Rasmussen believed the Claimant had a gas exchange abnormality caused by coal workers' pneumoconiosis. JA 318–19. Dr. Renn explained, however, that Dr. Rasmussen's arterial blood gas study contained sampling abnormalities. JA 531–32. He noted the protocol Dr. Rasmussen used to administer the blood gas studies is contrary to that suggested by the American Thoracic Society and the American College of Chest Physicians. JA 532–33. The ALJ failed to resolve this conflict in the experts'

opinions, in violation of the APA. *See* 5 U.S.C. § 557(c)(3)(A). The only other basis Dr. Rasmussen offers to support his diagnosis is the Claimant's history of coal mine dust exposure (*see* JA 163), which is insufficient to diagnose coal workers' pneumoconiosis or attribute pulmonary impairment to pneumoconiosis. *See Hicks*, 138 F.3d at 533.

Dr. Rasmussen's opinion is also poorly documented. He relied almost exclusively on data from his own examination. The ALJ discredited the opinion of Dr. Wantz in great part because Dr. Wantz "reviewed only a limited amount of data." JA 799. Like Dr. Rasmussen, the only information Dr. Wantz had available was from his own examination of the Claimant. Dr. Wantz was properly discredited due to the limited data he reviewed. The ALJ's failure to discredit Dr. Rasmussen for the same reason reveals he applies inconsistent standards to the medical evidence. *See Stone*, 957 F.2d at 362–63. The ALJ's crediting of Dr. Rasmussen's opinion is irrational, unsupported by substantial evidence, and contrary to law.

### b. Dr. Robert Cohen

The ALJ erred in giving significant weight to Dr. Cohen's opinion, as it is flawed and unreasoned. *See* JA 801–02. Dr. Cohen's reasoning for finding pneumoconiosis and attributing disability to pneumoconiosis amounts to: (1) Mr. Dempsey was exposed to coal mine dust; (2) Mr. Dempsey has symptoms of

43

chronic lung disease, pulmonary impairment, and gas exchange abnormalities; and (3) conclusory statements that coal mine dust caused these impairments because coal mine dust can cause such impairments. *See* JA 464–68, 746–47. This Court has rejected such "reasoning," in which impairment is assumed to have been caused by coal mine dust simply because the claimant was exposed to coal mine dust. *See Hicks*, 138 F.3d at 533.

Similarly, Dr. Cohen reported Mr. Dempsey "has no significant smoking history or history of other significant occupational exposures that could result in chronic lung disease." JA 746. But this explanation misses the point of the contrary x-ray interpretations diagnosing IPF: IPF, by definition, is an interstitial lung disease *where the cause is unknown*. Saying no history of another exposure exists that could cause Mr. Dempsey's lung disease only opens the door to IPF as a possible diagnosis; it does not exclude IPF as a potential cause. And saying Mr. Dempsey has no "other significant *occupational* exposures" to explain the lung disease only reveals the narrowness of Dr. Cohen's analysis. Dr. Cohen is resolutely focused on occupational exposures to explain Mr. Dempsey's medical condition and rules out the possibility of genetic or non-occupational causes. Dr. Cohen's exclusion of any possible cause unconnected with coal mine employment destroys the objectivity of his reasoning. The ALJ rejected this argument but did not explain why. *See* JA 801 ("I disagree with Employer's

44

contention that this position evidences a 'fixat[ion] on [identifying] occupational exposures to explain [miner's] medical condition [and an unwillingness to consider] even the possibility of non-occupational exposures or genetic causes.'").[11]    A conclusory rejection is not reasoned decision-making. *See Allentown Mack Sales and Serv.*, 522 U.S. at 374.

Dr. Cohen's reasoning discounting other physicians' negative x-ray re-readings also reveals he improperly shifted the burden of proof to Sewell to disprove pneumoconiosis or disability causation.    Dr. Cohen argued "[t]he presence of irregular opacities in no way rules out coal workers' pneumoconiosis." JA 747.    "Rule out" is the standard this Court requires to rebut the 15-year presumption of total disability due to pneumoconiosis.    *See Rose v. Clinchfield Coal Co.,* 614 F.2d 936 (4th Cir. 1980).    Dr. Cohen's "rule out" language indicates

---

[11]    The ALJ's citation to *Owens v. Mingo Logan Coal Co.*, 25 Black Lung Rep. (Juris) 1-1, 1-4 (Ben. Rev. Bd. 2011), also fails to support his holding.    JA 801. *Owens* is legally and factually distinguishable from this case because Owens was eligible for the 15-year presumption, *see* 30 U.S.C. § 921(c)(4), which then shifted the burden of proof to the employer to "rule out" the existence of a totally disabling pulmonary or respiratory impairment due to pneumoconiosis.    *Owens,* 25 Black Lung Rep. (Juris) at 1-10.    Furthermore, the regulations precluded the employer from rebutting that presumption by establishing a totally disabling obstructive respiratory or pulmonary disease of "unknown origin."    20 C.F.R. § 718.304(d) (2012).    The Claimant here is not eligible for the 15-year presumption, and therefore, retained the burden of affirmatively proving his condition arises out of coal mine dust exposure.    *See Greenwich Collieries*, 512 U.S. at 277–78.

he required Sewell to disprove pneumoconiosis and/or disability causation. As no presumptions apply here, Mr. Dempsey has the burden to prove his condition is due to coal mine dust exposure. *See Greenwich Collieries,* 512 U.S. at 277–78.

Dr. Cohen's shift of the burden of proof undermines his reasoning. Dr. Cohen argues irregular-shaped opacities do not rule out coal workers' pneumoconiosis. JA 747. Sewell does not claim irregular-shaped opacities "rule out" pneumoconiosis. The significance of irregular opacities, which Dr. Cohen admits present in only a minority of pneumoconiosis cases, *is that their presence means it is less likely the opacities are coal workers' pneumoconiosis*. Dr. Wiot, for example, explained the significance of irregular opacities:

> Q:  And would you diagnose pneumoconiosis based on irregular opacities?
>
> A:  Well, you know, you can't make a diagnosis of pneumoconiosis based on the opacities unless you consider the type and the distribution.
>
> Q:  Right, right. But I guess maybe another way to phrase it, if the type and distribution were there, would you do it based on your [sic] irregular shape opacities or would you need rounded opacities to diagnose pneumoconiosis?
>
> A:  Well, coal workers' pneumoconiosis?
>
> Q:  Just pneumoconiosis in general, I guess.
>
> A:  Well, if we're looking for coal workers' pneumoconiosis, as I mentioned, I think earlier, coal workers' begins in the upper lung fields. In this particular situation, Mr. Dempsey's upper lung fields are clear, there is nothing up there.

46

Now, most of the time — most of the time — rounded opacities are far and away the predominant opacity when you're dealing with coal or silica. On the other hand, when you're dealing with asbestos related disease, you're dealing with a disease process that invariably begins in the bottoms of the lungs and those opacities are rarely round, they almost invariably start out as so-called S type opacities. And then they're also going to be T size opacities.

So it's a combination of distribution and type which kind of allows you to raise the question of what type of disease progress you are dealing with. **With the full understanding that basilar interstitial fibrosis has multiple causes, one of them is not coal workers' pneumoconiosis.**

And it's also important to note, that upper lung filed, rounded opacities can occur in many other diseases. I mean I can show you patients who have sarcoid who, if I showed them to you, you'd say that is classical for coal workers' pneumoconiosis. These patients have never been in a coal mine.

So nothing is really 100 percent specific in the radiographic manifestations. But distribution and character helps you at least get into the ballpark.

JA 371–73 (emphasis added).

By requiring Sewell to "rule out" coal workers' pneumoconiosis, Dr. Cohen ignores the irregular opacities' significance—while imperfect, they are a strong indicator Mr. Dempsey does not have coal workers' pneumoconiosis. The ALJ summarily concluded: "I disagree that Dr. Cohen's report, which states that a finding of irregular opacities does not rule out pneumoconiosis, improperly shifts the burden to employer." JA 801 n.16. A conclusory finding is not reasoned decision-making. *See Allentown Mack Sales and Serv.*, 522 U.S. at 374. The

47

ALJ's crediting of Dr. Cohen's opinion is irrational, unsupported by substantial evidence, and contrary to law.

## VI.   CONCLUSION

Sewell Coal Company respectfully requests the Board's decision and order affirming the ALJ's award of benefits be reversed, or vacated and remanded for reconsideration under the BLBA and black lung regulations.

Respectfully submitted,

**SEWELL COAL COMPANY,**

By Counsel.

/s/ Kathy L. Snyder
Kathy L. Snyder
WV Bar No. 5995
Jeffrey R. Soukup
Kentucky Bar No. 92029
Jackson Kelly PLLC
P.O. Box 619
Morgantown, WV
(304) 284-4100

## VII.   REQUEST FOR ORAL ARGUMENT

This case presents questions of law important for consideration of claims under the BLBA.  Sewell respectfully requests this matter be set for oral argument to assist this Court in understanding the full extent of the medical, legal, and factual issues presented by the case.

## VIII.   ADDENDUM OF STATUTES, RULES, and REGULATIONS

Administrative Procedure Act, 5 U.S.C. § 557(c), in pertinent part:

(c) Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions--

(1) proposed findings and conclusions; or

(2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and

(3) supporting reasons for the exceptions or proposed findings or conclusions.

The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of--

(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record; and

(B) the appropriate rule, order, sanction, relief, or denial thereof.

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1556, 124 Stat. 119 (Mar. 23, 2010):

EQUITY FOR CERTAIN ELIGIBLE SURVIVORS.

(a) REBUTTABLE PRESUMPTION.—Section 411(c)(4) of the Black Lung Benefits Act (30 U.S.C. 921(c)(4)) is amended by striking the last sentence.

(b) CONTINUATION OF BENEFITS.—Section 422(l) of the Black Lung Benefits Act (30 U.S.C. 932(l)) is amended by striking '', except with respect to a claim filed under this part on or after the effective date of the Black Lung Benefits Amendments of 1981''.

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to claims filed under part B or part C of the Black Lung Benefits Act (30 U.S.C. 921 et seq., 931 [sic] et seq.) after January 1, 2005, that are pending on or after the date of enactment of this Act.

20 C.F.R. § 718.2 (2012):

With the exception of the second sentence of § 718.204(a), this part is applicable to the adjudication of all claims filed after March 31, 1980, and considered by the Secretary of Labor under section 422 of the Act and part 725 of this subchapter. The second sentence of § 718.204(a) is applicable to the adjudication of all claims filed after January 19, 2001. If a claim subject to the provisions of section 435 of the Act and subpart C of part 727 of this subchapter (*see* 20 CFR 725.4(d)) cannot be approved under that subpart, such claim may be approved, if appropriate, under the provisions contained in this part. The provisions of this part shall, to the extent appropriate, be construed together in the adjudication of all claims.

20 C.F.R. § 718.102 (2012):

(a) A chest roentgenogram (X-ray) shall be of suitable quality for proper classification of pneumoconiosis and shall conform to the standards for administration and interpretation of chest X-rays as described in Appendix A.

(b) A chest X-ray to establish the existence of pneumoconiosis shall be classified as Category 1, 2, 3, A, B, or C, according to the International Labour Organization Union Internationale Contra Cancer/Cincinnati (1971) International Classification of Radiographs of the Pneumoconioses (ILO-U/C 1971), or subsequent revisions thereof. This document is available from the Division of Coal Mine Workers' Compensation in the U.S. Department of Labor, Washington, D.C., telephone (202) 693-0046, and from the National Institute for Occupational Safety and Health (NIOSH), located in Cincinnati, Ohio, telephone (513) 841-4428) and Morgantown, West Virginia, telephone (304) 285-5749. A chest X-ray classified as Category Z

51

under the ILO Classification (1958) or Short Form (1968) shall be reclassified as Category 0 or Category 1 as appropriate, and only the latter accepted as evidence of pneumoconiosis. A chest X-ray classified under any of the foregoing classifications as Category 0, including sub-categories 0—, 0/0, or 0/1 under the UICC/Cincinnati (1968) Classification or the ILO-U/C 1971 Classification does not constitute evidence of pneumoconiosis.

 (c)   A description and interpretation of the findings in terms of the classifications described in paragraph (b) of this section shall be submitted by the examining physician along with the film. The report shall specify the name and qualifications of the person who took the film and the name and qualifications of the physician interpreting the film. If the physician interpreting the film is a Board-certified or Board-eligible radiologist or a certified "B" reader (*see* § 718.202), he or she shall so indicate. The report shall further specify that the film was interpreted in compliance with this paragraph.

 (d)  The original film on which the X-ray report is based shall be supplied to the Office, unless prohibited by law, in which event the report shall be considered as evidence only if the original film is otherwise available to the Office and other parties. Where the chest X-ray of a deceased miner has been lost, destroyed or is otherwise unavailable, a report of a chest X-ray submitted by any party shall be considered in connection with the claim.

 (e)  Except as provided in this paragraph, no chest X-ray shall constitute evidence of the presence or absence of pneumoconiosis unless it is conducted and reported in accordance with the requirements of this section and Appendix A. In the absence of evidence to the contrary, compliance with the requirements of Appendix A shall be presumed. In the case of a deceased miner where the only available X-ray does not substantially comply with paragraphs (a) through (d), such X-ray may form the basis for a finding of the presence or absence of pneumoconiosis if it is of sufficient quality for determining the presence or absence of pneumoconiosis and such X-ray was interpreted by a Board-certified or Board-eligible radiologist or a certified "B" reader (*see* § 718.202).

20 C.F.R. § 725.2 (2012):

(a)  This part sets forth the procedures to be followed and standards to be applied in filing, processing, adjudicating, and paying claims filed under part C of title IV of the Act.

(b)  This part applies to all claims filed under part C of title IV of the Act on or after August 18, 1978 and shall also apply to claims that were pending on August 18, 1978.

(c)  The provisions of this part reflect revisions that became effective on January 19, 2001. This part applies to all claims filed after January 19, 2001 and all benefits payments made on such claims. With the exception of the following sections, this part shall also apply to the adjudication of claims that were pending on January 19, 2001 and all benefits payments made on such claims: §§ 725.101(a)(31), 725.204, 725.212(b), 725.213(c), 725.214(d), 725.219(d), 725.309, 725.310, 725.351, 725.360, 725.367, 725.406, 725.407, 725.408, 725.409, 725.410, 725.411, 725.412, 725.414, 725.415, 725.416, 725.417, 725.418, 725.421(b), 725.423, 725.454, 725.456, 725.457, 725.458, 725.459, 725.465, 725.491, 725.492, 725.493, 725.494, 725.495, 725.547, 725.701(e). The version of those sections set forth in 20 CFR, parts 500 to end, edition revised as of April 1, 1999, apply to the adjudications of claims that were pending on January 19, 2001. For purposes of construing the provisions of this section, a claim shall be considered pending on January 19, 2001 if it was not finally denied more than one year prior to that date.

20 C.F.R. § 718.202(a)(1), (4) (2012), in pertinent part:

(a)    A finding of the existence of pneumoconiosis may be made as follows:

(1) A chest X-ray conducted and classified in accordance with Sec. 718.102 may form the basis for a finding of the existence of pneumoconiosis. Except as otherwise provided in this section, where two or more X-ray reports are in conflict, in evaluating such X-ray reports consideration shall be given to the radiological qualifications of the physicians interpreting such X-rays.

. . . .

53

(4) A determination of the existence of pneumoconiosis may also be made if a physician, exercising sound medical judgment, notwithstanding a negative X-ray, finds that the miner suffers or suffered from pneumoconiosis as defined in Sec. 718.201. Any such finding shall be based on objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories. Such a finding shall be supported by a reasoned medical opinion.

20 C.F.R. § 718.204(b), (c) (2012), in pertinent part:

(b)(1) Total disability defined. A miner shall be considered totally disabled if the irrebuttable presumption described in Sec. 718.304 applies. If that presumption does not apply, a miner shall be considered totally disabled if the miner has a pulmonary or respiratory impairment which, standing alone, prevents or prevented the miner: (i) From performing his or her usual coal mine work; and (ii) From engaging in gainful employment in the immediate area of his or her residence requiring the skills or abilities comparable to those of any employment in a mine or mines in which he or she previously engaged with some regularity over a substantial period of time. (2) Medical criteria.
. . . .

(c)(1) Total disability due to pneumoconiosis defined. A miner shall be considered totally disabled due to pneumoconiosis if pneumoconiosis, as defined in Sec. 718.201, is a substantially contributing cause of the miner=s totally disabling respiratory or pulmonary impairment. Pneumoconiosis is a Asubstantially contributing cause@ of the miner=s disability if it: (i) Has a material adverse effect on the miner=s respiratory or pulmonary condition; or (ii) Materially worsens a totally disabling respiratory or pulmonary impairment which is caused by a disease or exposure unrelated to coal mine employment.

54

## IX.  CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitations,
Typeface Requirements, and Type-Style Requirements

No.14-1401          Caption:  <u>Sewell Coal Company v. William Dempsey</u>

1.      This brief complies with the type-volume limitation of Fed.R.App.P.
32(a)(7)(B) because:

> this brief contains **<u>10,939</u>** words, excluding the parts of the brief
> exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5)
and the type style requirements of Fed.R.App.P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using
> Microsoft Word  2010 Version in Times New Roman 14 point font.

<u>/s/ Kathy L. Snyder</u>
*Counsel for Sewell Coal Company*

Dated: July 9, 2014

## X.   CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the **Opening Brief of Petitioner, Sewell Coal Company,** was served upon the following by electronic delivery and UPS Ground this **9th** day of July, 2014.

<u>**ELECTRONIC &**</u>
<u>**OVERNIGHT:**</u>     Patricia S. Connor, Clerk of Court
United States Court of Appeals for the Fourth Circuit
Lewis F. Powell, Jr. United States Courthouse Annex
1100 E. Main Street, Suite 501
Richmond, VA  23219-3517

<u>**ELECTRONIC:**</u>     Timothy C. MacDonnell
Washington & Lee University Law School
Lewis Hall, Room 106
Lexington, VA  24450

Gary K. Stearman
Barry H. Joyner
Office of the Solicitor
U. S. Department of Labor
200 Constitution Avenue, N. W.
Suite N-2117, NDOL
Washington, DC  20210

/s/ Kathy L. Snyder
*Counsel for Sewell Coal Company*

MO963559